IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| OHIO EDISON COMPANY<br><br>and<br><br>THE CLEVELAND ELECTRIC ILLUMINATING COMPANY,<br><br>    Plaintiffs,<br><br>    v.<br><br>DIRECT ENERGY BUSINESS LLC,<br><br>    Defendant. | Case No. 5:17-CV-00746<br><br>Judge Solomon Oliver, Jr.<br><br>Magistrate Judge Thomas M. Parker |

**DEFENDANT'S MOTION TO DISMISS
AND MEMORANDUM IN SUPPORT**

Defendant Direct Energy Business, LLC (Direct) respectfully requests issuance of an Order dismissing the Complaint under Rule 12(B)(6) of the Federal Rules of Civil Procedure. This motion should be granted for the reasons set forth below.

**I.     INTRODUCTION**

The sole count of the Complaint alleges "unjust enrichment." Unjust enrichment is an equitable remedy. Plaintiffs, a pair of affiliated electric distribution companies, would not be entitled to pursue an equitable remedy on their own behalf, because their relations with Direct are governed by an express written contract. "[U]njust enrichment cannot exist where there is a valid and enforceable written contract." *Younglove Const., LLC v. PSD Dev., LLC*, N.D.Ohio No. 3:08CV1447, 2010 WL 3515603, at *2 (Sept. 3, 2010). In fact, a complaint against Plaintiffs

for failing to honor their contract with Direct is pending before the Public Utilities Commission of Ohio (PUCO).

This may explain the convoluted path taken by Plaintiffs to present the claim. It is not really *their* claim, they say, but a claim assigned to them by a party that does not have a contract with Direct—the anonymous "Harmed Supplier." Complaint ¶¶ 12, 16, 19. But this does not solve Plaintiffs' problem; the Harmed Supplier has no claim to assign.

"The Ohio Supreme Court has held that in order for a plaintiff to confer a benefit on a defendant, an economic transaction must exist between the parties." *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Ents., Inc.*, 2015-Ohio-4884, 50 N.E.3d 955, ¶ 35 (4th Dist.), *appeal not allowed*, 145 Ohio St.3d 1444, 2016-Ohio-1596, 48 N.E.3d 583, *citing Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 22. The Complaint alleges *no* "economic transaction" between the Harmed Supplier and Direct. The transactions allegedly resulting in "unjust enrichment" were between PJM Interconnection LLC (PJM) and Direct. Nor do Plaintiffs allege facts showing that Direct had "knowledge of the benefit." *Id*. ¶ 34. The Complaint actually proves the contrary: the billing error at issue eluded discovery for as long as two years. And because Plaintiffs refuse to identify the Harmed Supplier, Direct still does not "know" who allegedly conferred a benefit upon it. Any of these issues is fatal to the claim.

But even if Plaintiffs had alleged the threshold facts, their decision to seek an equitable remedy demands a more complete explanation of this dispute than Plaintiffs have provided. The Complaint omits two critical facts. First, Plaintiffs' contract with Direct forbids the very artifice employed in the Complaint. Under the "Ohio Tariffs" (*see* Complaint ¶ 10), Plaintiffs are to "assume no responsibility for billing between a Certified Supplier and the Transmission Provider

[*i.e.*, PJM] or any party other than the Company." Exhibit A, Attachment 1 at § XII.C and Attachment 2 at Exhibit A thereto. Plaintiffs have not only "assumed responsibility" for a billing issue between the Harmed Supplier and PJM; Plaintiffs are now attempting to act as the alter ego of the Harmed Supplier.

Second, Plaintiffs failed to mention that they are defendants in a pending complaint proceeding at the PUCO. *See* Exhibit A, Attachment 2.[1] Direct filed that complaint in response to Plaintiffs' threats to effectively drive Direct out of business in the Plaintiffs' service territory, unless Direct agreed to write a $5.6 million check for Plaintiffs to sign over to the Harmed Supplier, whom Plaintiffs refused (and still refuse) to identify. The most elementary notions of corporate governance and risk management call for Direct to exercise *some* form of due diligence before agreeing to such a demand, which at a minimum would include identifying the entity allegedly owed the payment.[2] What Plaintiffs are doing is not right, and that is why Direct has asked the PUCO to step in. Direct holds no ill-gotten gains, and equity should not be marshaled against it.

The Complaint does not state a claim for unjust enrichment. Direct has stated a claim against Plaintiffs at the PUCO; that is where this dispute involving Plaintiffs, their unruly "computer system" (Complaint ¶ 13), and a persistently anonymous Harmed Supplier must be addressed.

---

[1] Plaintiffs' Answer in the PUCO proceeding is attached as Exhibit A, Attachment 3.
[2] It is worth mentioning that Plaintiffs are affiliated with a retail electric supplier that competes with Direct. If discovery in this proceeding or the PUCO proceeding reveals that the Harmed Supplier is Plaintiffs' affiliate, there will be serious repercussions at the PUCO, not to mention possible antitrust counterclaims in this action (if it proceeds). *See* Ohio Rev. Code 4928.17(A)(2-3) (requiring adherence to corporate separation plans that forbid distribution utilities from giving unfair competitive advantage to affiliated interests); Ohio Rev. Code 4928.06(E)(1)(PUCO authority to "resolve abuses of market power by any electric utility that interfere with effective competition in the provision of retail electric service."); Ohio Rev. Code Chapter 1331 (Ohio Valentine Act prohibiting trusts and combinations in restraint of trade).

## II. UNDISPUTED FACTS

Plaintiffs are electric distribution utilities. Complaint ¶ 7. Direct Energy is a competitive retail electric supplier. *Id.* ¶ 6. Electric distribution is a "monopoly" service regulated by the PUCO. *See, e.g., Application of Duke Energy Ohio, Inc.*, 148 Ohio St.3d 510, 2016-Ohio-7535, 71 N.E.3d 997, ¶¶ 3–4 (explaining distinction between "competitive" and "regulated" components of electric service). All electricity purchased by consumers is delivered by Plaintiffs, regardless of whether Direct or another entity is the source of supply. *See* Complaint ¶ 8. To ensure reasonable access to the distribution system on just and reasonable terms, Plaintiffs are required to deal with retail suppliers in accordance with the terms and conditions of their PUCO-approved Ohio Tariffs. *Id.* ¶ 10. Plaintiffs' Coordination Agreements with suppliers incorporate the terms and conditions of the Ohio Tariffs. Exhibit A, Attachment 2 at Exhibit A thereto, §§ 2.0, 5.0, 9.0.

Before electricity gets to Plaintiffs' distribution system, it must first pass through a regional grid. Regional grids are managed by "regional transmission organizations," or "RTOs," which are voluntary associations of the owners of transmission lines. *See, e.g., Ill. Commerce Comm'n v. FERC,* 576 F.3d 470, 473 (7th Cir. 2009). "PJM Interconnection ('PJM') is the RTO that manages the transmission system spanning New Jersey west to Chicago and south to North Carolina. As such, PJM governs the transmission of electricity to fifty million consumers in thirteen different states and the District of Columbia." *New Jersey Bd. of Pub. Utilities v. F.E.R.C.,* 744 F.3d 74, 81–82 (3d Cir. 2014); *see also* Complaint ¶ 9.

One of Plaintiffs' roles is to meter electricity delivered to consumers. As such, Plaintiffs are responsible for submitting customer usage data to PJM. *See* Complaint ¶ 11. PJM, in turn, relies on this information to determine how wholesale revenues and costs should be allocated,

4

and it bills or credits market participants' accounts accordingly. *See id*. The clearinghouse function performed by PJM eliminates the need for market participants to contract separately with each other. Not surprisingly, however, suppliers (like Direct) and utilities (like Plaintiffs) enter into contracts with one another (and with PJM) concerning the flows of money into and out of PJM. *See* Exhibit A, Attachment 2 at Exhibit A thereto.

In 2013 and 2014, three customers in Plaintiffs' service territory switched to Direct for their electricity supply. Complaint ¶ 12. The net effect of the "Supplier Mismatch Issue" described in the Complaint was that PJM credited the revenue associated with these customers to Direct, but continued to charge the cost of these customers' wholesale energy to the previous supplier. *Id*. ¶¶ 13–14. If these allegations are true, Direct was not billed enough, and the "Harmed Supplier" was billed too much. The source of the billing error? The "computer system" programmed and operated by Plaintiffs. *Id*. ¶ 13.

From 2013 to the end of 2015, no one—not Plaintiffs, not the Harmed Supplier, and not Direct—realized that Plaintiffs had been providing the wrong information to PJM. Only then did Plaintiffs "discover" the issue. *Id*. As detailed in Direct's PUCO complaint and admitted in Plaintiffs' PUCO answer, Plaintiffs approached Direct "on behalf of the previous supplier" to solicit a commitment to compensate the previous supplier for the amounts it allegedly overpaid and that Direct allegedly underpaid. Exhibit A, Attachment 2 at Exhibit A thereto ¶ 12; Attachment 3 ¶ 12. Direct's requests for additional information went unanswered, and the issue was seemingly dropped. *See id*. at Attachment 2, Exhibit A ¶¶ 12–13. Plaintiffs resurrected the issue in February 2017, and Direct responded that it would be willing to address the issue with the previous supplier. *Id.* ¶ 13. Plaintiffs refused to identify the supplier. *Id*. Plaintiffs then started issuing an ever-escalating series of threats against Direct, including declaring Direct in

5

breach of the Coordination Agreements and garnishing the financial security posted by Direct to supply customers on Plaintiffs' system. *See id*. ¶ 23 and Attachment 3 ¶ 23 ("The Companies have advised [Direct] that drawing on [Direct's] letter of credit is an option if [Direct] does not settle its $5.6 million windfall.").

Plaintiffs' status as the monopoly distribution provider gives them tremendous leverage over retail suppliers. Declaring Direct in breach of the Coordination Agreements would effectively force Direct out of the market in Plaintiffs' service territories. Plaintiffs' threatening tactics left Direct with little choice but to file the PUCO complaint. This lawsuit followed three weeks later.

### III. ARGUMENT

"In Ohio, a claim of unjust enrichment requires a plaintiff to establish (1) a benefit conferred by the plaintiff upon a defendant, (2) the defendant's knowledge of the benefit, and (3) the defendant's retention of the benefit under circumstances where it would be unjust to do so without payment." *Younglove*, 2010 WL 3515603 at *2, *citing Cantwell Mach. Co. v. Chicago Mach. Co.,* 184 Ohio App.3d 287, 2009-Ohio-4548, 920 N.E.2d 994, ¶ 15 (10th Dist.).

"In deciding a motion to dismiss under Rule 12(b)(6), 'a court should assume the veracity' of 'well-pleaded factual allegations,' but it need not accept a plaintiff's legal conclusions as true." *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, 684 F.Supp.2d 942, 946 (N.D. Ohio 2009), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Bihn v. Fifth Third Mortg. Co.*, 980 F. Supp. 2d 892, 897–98 (S.D. Ohio 2013) (internal quotations omitted).

Plaintiffs have not alleged facts that establish any of the elements of a claim for unjust enrichment. First, assuming Direct received a "benefit" from being under-billed, the benefit was

conferred by PJM, *not* the Harmed Supplier. Second, although the alleged benefit was a direct result of Plaintiffs' errors, no one (including Plaintiffs) knew about those errors until well after the fact. Third, there is no inequity in preserving the status quo while the PUCO sorts out whether the Supplier Tariff and Coordination Agreement require or allow the actions Plaintiffs are demanding. To the contrary, it would be unjust to allow the Plaintiffs to pursue equitable relief that the Supplier Tariff and Coordination Agreements specifically bar.

A.    **The Harmed Supplier did not confer a benefit on Direct.**

For present purposes, this motion assumes that *if* in fact PJM billed Direct $5.6 million less than it should have, Direct received a "benefit." But the mere receipt of a benefit is not sufficient to establish an unjust enrichment claim.

"[A] plaintiff must establish that a benefit has been conferred *upon that defendant by that particular plaintiff.*" *Bihn* at 904 (emphasis added). *See also Abel v. KeyBank USA, N.A.*, N.D. Ohio No. 1:03 CV 524, 2003 WL 26132935, *13 (Sept. 24, 2003) ("Because plaintiffs do not allege that *they* conferred a benefit on defendants, there can be no claim for unjust enrichment.") (emphasis added); *Hernandez v. Wilkinson*, N.D. Ohio No. 1:06-CV-158, 2007 WL 128910, *2–3 (Jan. 12, 2007) (state officials sued in individual capacity were not unjustly enriched where they never personally held money allegedly belonging to plaintiff). Any "benefit" Direct received was *not* conferred by the Harmed Supplier. This is fatal to Plaintiffs' claim.

No facts alleged in the Complaint support a conclusion that the Harmed Supplier conferred a benefit on Direct. To show that a particular plaintiff conferred a benefit on a particular defendant, "an economic transaction must exist between the parties." *Caterpillar*, 2015-Ohio-4884, 50 N.E.3d 955, ¶ 35. The economic transactions alleged in the Complaint involve (i) Plaintiffs' interactions with PJM (Complaint ¶ 13), (ii) PJM's interactions with Direct (*id*. ¶ 14), and (iii) PJM's interactions with the Harmed Supplier (*id*.). There are *no* allegations of

7

any direct exchange of money, services, or other consideration between the Harmed Supplier and Direct.

The Plaintiffs allege that the "Harmed Supplier conferred a benefit upon Direct Energy *by paying for Direct Energy's load costs*[.]" Complaint ¶ 19 (emphasis added). But this is not an accurate description of the facts alleged. If Harmed Supplier were overbilled, it does not follow that Harmed Supplier conferred a benefit on Direct. Consider: if Harmed Supplier had *not* been overbilled, Direct would have received the same "benefit." Likewise, if Harmed Supplier had refused to pay the alleged overcharge, Direct still would have received the same "benefit." The point is that the alleged benefit to Direct (underbilling) bore no connection whatsoever to any payments made by Harmed Supplier. At most, the Harmed Supplier paid too much to PJM. But it did not pay anything to Direct, and even indirectly, its loss did not accrue to Direct's gain.

The Complaint does not, and cannot, allege that the *Harmed Supplier and Direct* were parties to an "economic transaction" in which one conferred a benefit on the other. The benefit and detriment described in the Complaint resulted from separate transactions involving different parties, and the benefit and detriment existed independent of each other. While the Complaint may have shown that the Harmed Supplier suffered some loss, an unjust enrichment claim is intended "not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on a defendant." *Johnson* at ¶ 21 (quotations omitted). The first element of an unjust enrichment claim cannot be met here.

**B.     Direct had no knowledge of the benefit.**

The second required element of an unjust enrichment claim is "the defendant's knowledge of the benefit." *Cantwell*, 184 Ohio App.3d 287, ¶ 15. Being that no benefit was conferred by the Harmed Supplier on Direct, "knowledge of the benefit" is an impossibility. But

8

even if some benefit were conferred, the Complaint alleges no supporting facts to satisfy the knowledge element.

The Complaint does not allege that *anyone* knew that Plaintiffs had given erroneous information to PJM until well after the fact. The Supplier Mismatch Issue occurred as early as 2013 but "continued until discovered and corrected by the Companies in late 2015." Complaint ¶ 13. The Plaintiffs approached Direct "[a]fter discovering the error." *Id*. ¶ 15. Direct *still* does not fully understand the nature and extent of the "error" because Plaintiffs will not provide the most basic information—such as the identity of the Harmed Supplier. Given that Plaintiffs refuse to identify the Harmed Supplier, how *could* Direct "know" that *Harmed Supplier* conferred a benefit? Even after the filing of the Complaint, Direct still does not know who allegedly conferred a benefit upon it.

That Direct "knew it was obligated to pay for its actual customer load" does not establish knowledge of a benefit. Complaint ¶ 20. This generality does not allege facts supporting specific knowledge of the conferral of the benefit. In particular, the Complaint does not, and cannot, allege facts showing that Direct had reason to believe it was *not* paying for actual customer load. Direct paid Plaintiffs to furnish load information to PJM, relied on Plaintiffs to do their job, and then paid what it was billed by PJM. The Complaint does not allege facts showing that Direct knew it was being underbilled, or how and when it could have gained this knowledge. To the contrary, Plaintiffs own allegations demonstrate that the error was not obvious but obscure: the issue was *not* identified by the Harmed Supplier, and it took up to two years for Plaintiffs to "discover" the issue. *Id*. ¶¶ 12–13; Exhibit A, Attachment 3 at ¶¶ 8–9. Other than the conclusory recitation of the element of the claim, the Complaint fails to allege any facts substantiating that Direct had knowledge of the benefit.

9

What Plaintiffs attempt to characterize as "knowledge" is really a form of "passive acceptance" described in *Morgan v. Mikhail*, where money allegedly belonging to the plaintiff was deposited in the defendant's bank account. The appellate court affirmed dismissal of the unjust enrichment claim. Although the defendant had engaged in the "passive act of permitting [plaintiff] to deposit money into his bank account," this was not enough to prove the knowledge element: "appellant has not alleged that [defendant] had any knowledge that the money belonged to appellant. His claim for unjust enrichment must fail." 10th Dist. Franklin Nos. 04AP-195, 04AP-196, 2004-Ohio-5792, ¶¶ 21–24.

Just as the plaintiff in *Morgan* failed to allege or demonstrate the defendant's knowledge that money deposited in his account belonged to someone else, Plaintiffs allege no facts sufficient to draw a conclusion that Direct knew, or even could have known, that it was being under-billed or that the Harmed Supplier was being overbilled.

**C.   It would be inequitable to require Direct to do anything before the PUCO decides the pending complaint or to permit Plaintiffs to circumvent the Ohio tariffs.**

The third element of unjust enrichment requires Plaintiffs to show that "defendant's retention of the benefit . . . would be unjust." *Cantwell*, 184 Ohio App.3d 287, at ¶ 15. Because Plaintiffs cannot satisfy the first or second elements, there is no need to dwell on the third. Direct would simply note that dismissal of the Complaint would not be equivalent to an adjudication that Direct should "retain" any benefit. The Supplier Tariff and Coordination Agreements bear on that issue, and the PUCO will address that question in the pending complaint.

On the topic of equity and justice generally, the doctrine of "unclean hands" comes into play: "[A] party seeking the equitable remedy of unjust enrichment must come to the court with clean hands. It is therefore a fundamental rule of equity that he who seeks equity must do equity." *Directory Services Group v. Staff Builders Intern., Inc.*, 8th Dist. Cuyahoga No. 78611,

10

2001 WL 792715, at *3 (July 12, 2001). The Ohio Tariffs and Coordination Agreements specifically govern the matter in dispute, and specifically prohibit Plaintiffs' assertion of rights on behalf of third parties. *Compare* Exhibit A, Attachment 1 § XII.C (Plaintiffs "will assume no responsibility for billing between a Certified Supplier and [PJM] or any party other than the Company") *with* Complaint ¶ 22 ("Direct should be required to pay to the Companies as the successor-in-interest to the Harmed Supplier via its assignment of claims to the Companies").

Plaintiffs breached this covenant by approaching Direct on behalf of the Harmed Supplier to begin with, and they have merely doubled-down on that wrongdoing by accepting an assignment and suing Direct in federal court. If the anonymous Harmed Supplier turns out to be Plaintiffs' affiliate (and Direct's competitor), the inequity will only compound yet again.

**IV. CONCLUSION**

The facts alleged in the Complaint do not state a claim for unjust enrichment. No inferences can be drawn from Plaintiffs' allegations to substitute for elements of the claim not met. The Complaint should be dismissed.

Dated: May 12, 2017                               Respectfully submitted,

*/s/ Mark A. Whitt*
Mark A. Whitt
Andrew J. Campbell
**WHITT STURTEVANT LLP**
88 E. Broad St., Suite 1590
Columbus, Ohio 43215
Telephone: (614) 224-3946
Facsimile: (614) 224-3960
whitt@whitt-sturtevant.com
campbell@whitt-sturtevant.com

ATTORNEYS FOR DIRECT
ENERGY BUSINESS, LLC

## STATEMENT OF COMPLIANCE

The undersigned certifies that this filing complies with the page limits specified in Local Rule 7.1(F)

> */s/ Mark A. Whitt*
> One of the Attorneys for Direct Energy Business, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2017, a copy of foregoing Motion to Dismiss and Memorandum in Support was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

> */s/ Mark A. Whitt*
> One of the Attorneys for Direct Energy Business, LLC